Filed 4/27/26  P. v. Aytman CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TORRIAN AYTMAN,<br><br>Defendant and Appellant. | F089540<br><br>(Super. Ct. No. VCF268356)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Brad J. Poore, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary, Eric L. Christoffersen, Robert K. Gezi and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

On July 30, 2011, Orlandis Perkins (Perkins) was shot and killed. Appellant and defendant Torrian Aytman (appellant) was charged with murder with the gang special circumstance. In 2014, he entered a plea to voluntary manslaughter with firearm and gang enhancements, and was sentenced to 20 years. In 2016, this court affirmed the judgment on direct appeal.[1]

In 2022, appellant filed a petition for resentencing of his voluntary manslaughter conviction pursuant to section 1172.6, and alleged he was eligible because of the amendments to the felony-murder rule and natural and probable consequences doctrines enacted by Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). (*People v. Curiel* (2023) 15 Cal.5th 433, 440.)[2] The trial court relied on the preliminary hearing transcript and this court's opinion in *Aytman I* from appellant's direct appeal, found he was the actual killer, and held he failed to make a prima facie case for resentencing.

In *Aytman II*, we held the trial court erroneously relied on *Aytman I*'s factual statement and the preliminary hearing transcript to find appellant failed to make a prima facie case, the error was prejudicial, and remanded for issuance of an OSC and an evidentiary hearing.[3]

---

[1] We granted appellant's request to take judicial notice of the records and opinions in his two prior appeals: *People v. Aytman* (Apr. 11, 2016, F069660) (nonpub. opn.) (*Aytman I*), which affirmed the judgment on direct appeal; and *People v. Aytman* (F085624, Sept. 12, 2023) (nonpub. opn.) (*Aytman II*), which reversed the trial court's denial of appellant's Penal Code section 1172.6 petition for failing to state a prima facie case, and remanded for issuance of an order to show cause (OSC) and an evidentiary hearing. (All further statutory citations are to the Penal Code unless otherwise indicated.)

[2] "Appellant filed his petition in 2022 under former section 1170.95, which was renumbered as section 1172.6 without substantive change on June 30, 2022. [Citation.] As such, we refer to the subject statute by its current number throughout this opinion unless otherwise indicated." (*Aytman II, supra*, F085624.)

[3] *Aytman II* was filed prior to the decision in *People v. Patton* (2025) 17 Cal.5th 549 (*Patton*), which subsequently held the trial court may "rely on unchallenged, relief-foreclosing

2.

On remand, the trial court partially granted appellant's motion to exclude certain preliminary hearing testimony from its consideration at the section 1172.6 evidentiary hearing. At the hearing, the court heard testimony from N.J., an eyewitness, who claimed she could not remember anything about the shooting; two officers, who testified to N.J.'s prior inconsistent statements where she described the shooting and identified appellant as the shooter; and a defense investigator, who testified to another prior inconsistent statement by N.J., where she disavowed her prior identifications of appellant and said she did not know if appellant shot the victim.

The court found N.J.'s hearing testimony was purposefully evasive and her prior statements to the officers were credible, and held "the evidence establishes, beyond a reasonable doubt, that [appellant] personally shot and killed Mr. Perkins, with the intent to kill Mr. Perkins—without provocation and without a belief in the need to use deadly force to protect himself," and denied his petition.

On appeal, appellant asserts the trial court's factual and credibility findings from the evidentiary hearing are not supported by substantial evidence because the People failed to prove Perkins died as a required element of murder, the court's credibility rulings were erroneous as to N.J.'s hearing testimony and consideration of her prior inconsistent statements, the court should have granted his motion to exclude all gang evidence as inadmissible as a result of the amendments to section 186.22 enacted by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), the gang evidence was also inadmissible because it was prejudicial character evidence, the court allegedly shifted the burden to appellant to prove his self-defense claim at the evidentiary hearing, and the evidence supported his self-defense claim. We affirm.

---

facts within a preliminary hearing transcript to refute conclusory, checkbox allegations" in a petition to make the prima facie determination. (*Id*. at p. 564.)

**FACTUAL AND PROCEDURAL BACKGROUND**

On May 31, 2012, a felony complaint was filed in the Superior Court of Tulare County charging appellant with count 1, murder of Perkins on or about July 30, 2011, with firearm and gang enhancements; and count 2, street terrorism.

**The Preliminary Hearing Evidence**

On June 3, 2013, the trial court conducted the preliminary hearing. The following is the entirety of the testimony that was introduced.[4]

### *Discovery of Victim's Body*

Tulare Police Officer Aguayo testified that on July 30, 2011, he responded to a dispatch about a gunshot victim at E Street and Bardsley, where there were apartment

---

[4]  Section 872, subdivision (b), enacted by Proposition 115, which was approved by the voters in 1990, creates a limited hearsay exception and permits the court to make the probable cause finding at the preliminary hearing "based in whole or in part upon the sworn testimony of a law enforcement officer or honorably retired law enforcement officer" relating out-of-court statements by crime victims or witnesses. (*Walker v. Superior Court* (2021) 12 Cal.5th 177, 197.)

Section 1172.6, subdivision (d)(3) states that at the evidentiary hearing on a petition for resentencing, "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.… However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule."

Prior to appellant's section 1172.6 evidentiary hearing, the trial court granted the People's request to take judicial notice of the preliminary transcript as part of the evidentiary hearing. Appellant filed a motion to exclude hearsay and gang evidence that was admitted at the preliminary hearing. For purposes of the evidentiary hearing, the trial court excluded all hearsay evidence admitted at the preliminary hearing pursuant to section 872, subdivision (b), that was not otherwise admissible pursuant to another hearsay exception. (§ 1172.6, subd. (d)(3).) The court partially granted appellant's objections to gang evidence from the preliminary hearing.

We recite the entirety of the preliminary hearing evidence, and note the trial court's rulings as to evidence it excluded from consideration at the evidentiary hearing.

In parts III., V., and VIII. of the Discussion below, we address appellant's contentions about the court's evidentiary rulings on N.J.'s prior statements, the gang evidence, and evidence of perfect or imperfect self-defense.

complexes.  Aguayo arrived at the scene at approximately 12:57 a.m.  Aguayo encountered a large crowd of approximately 75 to 150 people on the street, and he described the scene as "chaos."

Aguayo testified he saw a Black male lying in pool of blood on the side of E Street.  The victim was unresponsive and did not show signs of breathing.  Aguayo could not determine if the victim was dead.  Aguayo did not see a gun or any shell casings.  Aguayo testified he observed four to five gunshot wounds on the victim's body: one in the left side of his head from which brain matter was coming out, several wounds in the side of his abdomen, and one in his back area.

Aguayo testified emergency medical personnel arrived at the scene to treat and transport the victim, and he followed them to the hospital.  Aguayo overheard a doctor at the hospital say the victim died.  Aguayo collected the victim's clothes and personal items from the hospital, which included a blue shirt, two sneakers, and an identification card for Perkins.  Perkins was not found in possession of a weapon.[5]

The parties stipulated the autopsy showed that Perkins's cause of death was gunshot wounds.[6]

### Officer Guzman's Testimony About N.J.'s Statements

Guzman also responded to the scene, and testified that around 1:30 a.m., he conducted a recorded interview with N.J. in the carport of the apartment complex where

---

[5]     Guzman's testimony about his observations at the scene, the victim's body, and other matters was not admitted as hearsay under section 872, subdivision (b), but based on his personal knowledge and thus admissible at the evidentiary hearing.  (Evid. Code, § 702, subd. (a); *People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1248.)

[6]     On appeal, appellant asserts the parties entered the stipulation about Perkins's cause of death only for purposes of the preliminary hearing, and there was no evidence introduced at the evidentiary hearing that Perkins died.  As will be discussed in part II. of the Discussion, appellant failed to raise this claim before or during the evidentiary hearing, and has waived the argument on appeal.

the incident occurred. Guzman testified N.J. was approximately 19 or 20 years old. She was extremely upset and did not appear intoxicated.

Guzman testified N.J. made the following statements about the shooting. N.J. arrived at a party in an apartment around 11:00 p.m., and Teflon Gang members were there. Perkins arrived around midnight, he went inside the apartment, and N.J. said hello to him. Perkins looked around and left.

N.J. said she walked out of the apartment, went outside, and saw appellant walking around. N.J. knew appellant from high school, and said appellant was wearing a blue jersey over a white shirt.

N.J. thought something was wrong, because appellant was standing across the street from B.R. and K.M., and appellant was "mugging" or "[m]addogging" them, and giving them "dirty looks."

N.J. said appellant walked eastbound towards E Street. Perkins ran up from behind her. Perkins ran past N.J. and kept running toward appellant from behind him. N.J. saw Perkins "lunge" at appellant. She heard people yell, "'[s]hoot that [N-word]'" several times. N.J. did not know who shouted the phrase.

N.J. said appellant turned around and he was holding a handgun. Appellant fired one gunshot at Perkins. N.J. ran and took cover, but she kept looking towards them. N.J. said Perkins fell down and appellant shot Perkins two to three more times. Appellant ran away and N.J. called 911. N.J. said she never saw Perkins with a gun.

Guzman testified that after speaking with N.J., he prepared a six-person photographic lineup that included appellant's picture in the fourth position. At approximately 5:00 a.m., Guzman showed the lineup to N.J., and she immediately identified appellant as the shooter and circled his photograph. N.J. wrote on the lineup card: "'He was standing on the side and started walking. And I seen [*sic*] Orlandis [Perkins] run up, and he turned, and he shot.'"

6.

Guzman testified he was familiar with the Mob and Teflon gangs, and both had African-American members. Guzman knew B.R. and K.M. were members of the Mob gang.

### *Detective Haney's Testimony About the Initial Investigation*

Haney, the chief investigating officer, testified he arrived at the shooting scene around 1:20 a.m. There was ample overhead street lighting. Haney observed a bloodstain where Perkins's body was found on the street. Approximately 20 feet from the bloodstain, Haney found a single checkered tennis shoe that was collected as evidence. Haney determined the party had been held that night for the release of appellant's rap CD.

Haney testified that at 7:00 a.m. on July 30, 2011, he participated in serving a search warrant at the residence where appellant lived with his parents. Appellant was not home. Appellant's brother said appellant was known to associate with Teflon members.[7]

### *Appellant's Post-Miranda Interview*

Haney testified that later on July 30, 2011, appellant voluntarily turned himself in, and he took appellant to the police station. Haney advised appellant of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and conducted an interview.

Haney testified appellant's demeanor was calm and cool. Appellant said he was at the party, heard shots fired, and ran away. Haney asked appellant if he left a shoe behind at the scene. Appellant denied it, and said he was wearing the same shoes at the interview that he wore at the party. Haney asked if he was a member of the Teflon gang. Appellant replied, "'[y]ou can say'" that he is "'an associate.'" Haney asked if Perkins was in a gang. Appellant said "[h]e believed [Perkins] was a member" of the 209 Mob.

---

[7] For purposes of the evidentiary hearing, the court granted appellant's motion to exclude Haney's preliminary hearing testimony about the statements made by appellant's brother because the hearsay evidence was introduced pursuant to section 872, subdivision (b). (§ 1172.6, subd. (d)(3).)

Haney testified he asked appellant about some abrasions on his hands, and appellant said he had a fight "with a Mexican dude."[8]  A gunshot residue test on appellant's hands was negative.

Haney testified appellant was subsequently released from custody.  On August 18, 2011, Haney served a search warrant at a house in Arroyo Grande that belonged to appellant's rap music producer; appellant was present at the time.  The officers found weapons that belonged to another person.  Haney testified that a computer in that house was seized, and it contained several videos of Teflon members with guns, and videos of appellant rapping about Teflon.  R.C. was present during the search, and said they had been at a release party for appellant's CD on the night of the shooting.  He also said appellant borrowed his shoes just before appellant turned himself in.

Haney testified the computer also contained a video of appellant, and he was wearing shoes with the same pattern that matched the single shoe found at the homicide scene.

Haney testified he interviewed other people who attended the party, and they said that C.G., the leader of Teflon at the time, was the person who shouted at appellant to shoot.  Haney also determined Perkins may have been the leader of the Mob.

### ***Haney's Interview With N.J.***

Haney testified he interviewed N.J. on May 2, 2012, nearly a year after the homicide, to determine if she could identify who shouted "'[s]hoot'" before appellant fired at Perkins.  N.J. could not identify who said it.  Haney reviewed with N.J. her prior statements to Guzman, and "everything remained the same."[9]  Espinoza testified the Mob

---

**8**     For purposes of the evidentiary hearing, the court denied appellant's motion  to exclude Haney's preliminary hearing testimony about appellant's statements, including about gang affiliation, because appellant's statements constituted admissions by a party pursuant to Evidence Code section 1220.  (*People v. Richee* (2025) 111 Cal.App.5th 281, 305.)

**9**     For purposes of the evidentiary hearing, the court granted appellant's motion to exclude Haney's testimony about the entirety of his interview with N.J., and his interviews with R.C., the

gang had been around since the 1990's. It was originally known as the "209 Mob," and it was renamed the "Mob" when the local area code changed. A Mob member formed Teflon in 2001. Both Teflon and the Mob were Crip gangs, and their members wore blue. There were about 100 members of the Mob, and 15 to 30 members of Teflon. Perkins was shot in Mob territory.

Espinoza interviewed several gang members about what happened at the party, and they said Perkins punched a Teflon member, Perkins called out "Mob" while others said "Teflon," and appellant shot Perkins.

Espinoza testified that "[b]efore this incident, Teflon and the Mob used to associate" and they went to school together, "[b]ut then [after the] Orlandis Perkins murder, you don't see them associating anymore."

> "Q. They're not, then traditional rivals in the sense of rivalry when you look at dynamics in other gangs? For example, the north/south. Is it the same type of rivalry?
>
> "A. I would say it is now, but before the homicide it wasn't. Because Tulare is so small, you have members from Teflon and the Mob that are family members, that are blood from cousins to brothers, uncles.

---

people present at the shooting scene, and those who were present during the search of the Arroyo Grande residence, since the hearsay evidence was introduced at the preliminary hearing pursuant to section 872, subdivision (b). (§ 1172.6, subd. (d)(3).) The court admitted Haney's testimony about his observation of the video on the computer, that showed appellant wearing shoes similar to the type found at the shooting scene.

The court granted appellant's motion to exclude Haney's testimony about the discovery of guns at the Arroyo Grande residence. The court also excluded the rap videos found on the computer pursuant to Evidence Code section 352.2, which "requires a trial court to take specific considerations into account when determining the admissibility of creative material." (*People v. Aguirre* (2025) 18 Cal.5th 629, 683 (*Aguirre*).)

At the time of the court's ruling, the retroactivity of Evidence Code section 352.2 had not been decided. The California Supreme Court subsequently held Evidence Code section 352.2 only applied prospectively, it did not apply retroactively even to cases not yet final on appeal, but the new statute set forth several factors that the trial court "*already* might have folded into an evaluation of whether this type of material was admissible under Evidence Code sections 352 and 1101." (*Aguirre, supra*, 18 Cal.5th at pp. 692–693.)

9.

So before, it wasn't rivalry the way it is now since Orlandis Perkins' murder."

Espinoza testified that based on his review of police reports, appellant was a member of the Crips. Espinoza also testified that from his own conversations with appellant, he knew appellant had been a member of the Crips for a while.

Espinoza testified he had been personally involved in the investigation of Teflon's primary activities, which were drive-by shootings, homicides, robberies, attempted robberies, and assault and battery.

Espinoza testified about a predicate act committed by a Teflon gang member, based on his review of police reports and his interrogation of the perpetrator, Robert S. On August 27, 2010, Robert S. drove by two members of the Mob in Tulare, the Mob members flashed gang signs, Robert S. felt disrespected, and Robert S. fired several shots at the Mob members. Robert S. was convicted of assault with a deadly weapon with a gang enhancement.[10]

The prosecutor asked Espinoza a series of lengthy hypothetical questions based on the shooting of Perkins and Espinoza's interviews with other witnesses. Espinoza testified the shooting was gang-related because the shooter was representing his gang against a member of a different gang.[11]

---

[10]    The prosecutor advised the court that for purposes of the preliminary hearing, he would establish Teflon's predicate crimes based on the Robert S. incident and the charged offenses against appellant.

[11]    For purposes of the evidentiary hearing, the court granted appellant's motion to exclude Espinoza's testimony about the hearsay statements made by various individuals and contained in reports, because the evidence was admitted at the preliminary hearing pursuant to section 872, subdivision (b). (§ 1172.6, subd. (d)(3).)

The court excluded Espinoza's responses to the prosecutor's hypothetical questions that were based on the facts of the shooting, pursuant to *People v Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), which held that "[g]ang experts, like all others, can rely on background information accepted in their field of expertise under the traditional latitude given by the Evidence Code. They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven. They may also

10.

On cross-examination, defense counsel asked Espinoza why the Teflon and Mob gang members did not get along at the party on the night of the shooting, if they had been able to attend school together. Espinoza testified: "But [what] you have to understand is prior to this shooting [of Perkins], we had Robert [S.] shooting at Mob members [in 2010]. And prior to that shooting, we had other shootings with Mob members."

## APPELLANT'S PLEA

On June 14, 2013, the information was filed that charged appellant with count 1, murder (§ 187, subd. (a)), with the special circumstance that appellant intentionally killed Perkins while an active participant in a criminal street gang and the murder was carried out to benefit a criminal street gang (§ 190.2, subd. (a)(22)). As to count 1, it was further alleged that appellant personally and intentionally discharged a firearm, which proximately caused great bodily injury and death (§ 12022.53, subd. (d)) and he committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C), (5)).

Appellant was also charged with count 2, street terrorism (§ 186.22, subd. (a)). (*Aytman II, supra*, F085624.)

### Plea and Sentence

On February 24, 2014, the scheduled first day of trial, appellant pleaded no contest to an amended count 1, voluntary manslaughter (§ 192, subd. (a)), admitted a gang enhancement (§ 186.22, subd. (b)(1)(C)), and that he personally used a firearm in the commission of the offense (§ 12022.5, former subd. (a)(1)).

---

rely on nontestimonial hearsay properly admitted under a statutory hearsay exception. What they cannot do is present, as facts, the content of testimonial hearsay statements." (*Id.* at p. 685.)

In parts IV. and V. of the Discussion, we will discuss appellant's contentions that the court should have excluded the entirety of the gang evidence at the section 1172.6 evidentiary hearing.

11.

The court found a factual basis for the plea based on its review of the preliminary hearing transcript and the information, and "numerous discussions with counsel." The court dismissed the remaining charges and allegations.

On May 5, 2014, the court sentenced appellant to 20 years in prison based on the midterm of six years for voluntary manslaughter and consecutive terms of 10 years for the gang enhancement and four years for the firearm enhancement. (*Aytman II, supra*, F085624.)

**Direct Appeal**

In appellant's direct appeal from the judgment, appellate counsel filed a brief that requested this court independently review the record pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*). Appellant did not respond to this court's invitation to submit additional briefing. On April 11, 2016, this court filed the nonpublished opinion in *Aytman I* that briefly summarized the evidence introduced at the preliminary hearing and affirmed the judgment. (*Aytman I, supra*, F069660; *Aytman II, supra*, F085624.)

## PETITION FOR RESENTENCING

On August 3, 2022, appellant filed a form petition for resentencing of his voluntary manslaughter conviction pursuant to section 1172.6, and alleged he was eligible pursuant to the amendments enacted by Senate Bill 1437 to sections 188 and 189.

In opposition to the petition, the People relied on *Aytman I*'s factual summary of the preliminary hearing evidence and argued appellant was convicted as the actual perpetrator. In his reply brief, appellant asserted the court could not rely on the factual summary in *Aytman I* to make the prima facie determination. (*Aytman II, supra*, F085624.)

**The Trial Court's Prima Facie Hearing**

On January 18, 2023, the trial court denied the petition for failing to make a prima facie case for resentencing. The court relied on the factual statement in *Aytman I*, which

was taken from the preliminary hearing evidence, and held appellant was convicted as the actual killer. (*Aytman II, supra*, F085624.)

### *Aytman II*

In this court's nonpublished opinion in *Aytman II*, filed before the Supreme Court's decision in *Patton*, we held the trial court erroneously relied on *Aytman I*'s factual statement from the preliminary hearing transcript to find appellant failed to make a prima facie case. We found the error was prejudicial, and remanded for issuance of an OSC and an evidentiary hearing. (*Aytman II, supra*, F085624.)

## PROCEEDINGS ON REMAND

On November 17, 2023, the trial court issued the OSC and set a schedule for briefing and the section 1172.6 evidentiary hearing.

### The People's Hearing Brief

The prosecutor filed a hearing brief and moved for the trial court to take judicial notice of the preliminary hearing transcript. In doing so, the prosecutor acknowledged that the officers' hearsay testimony that was admitted at the preliminary hearing pursuant to section 872, subdivision (b), was expressly excluded from the evidentiary hearing under section 1172.6, subdivision (d)(3), in the absence of another hearsay exception, and should be excluded.

The prosecutor moved to call N.J. to testify at the evidentiary hearing because she was an eyewitness to the homicide. The prosecutor asserted the preliminary hearing testimony of Espinoza, who testified as the gang expert, was relevant and admissible to address "the rivalry between 'Teflon' gang members and '209 Mob' gang members. [The gang expert] discussed briefly the history of the two gangs and how they came about in the area. He also mentioned that since the murder of Orlandis Perkins, the rivalry between the gangs has intensified and the two no longer associated as they had in the past, since both gangs identify as Crips."

13.

## Appellant's Evidentiary Objections

On February 13, 2024, appellant filed objections to the court's consideration of certain preliminary hearing testimony at the evidentiary hearing.

Appellant agreed hearsay testimony from the officers that was admitted at the preliminary hearing under section 872, subdivision (b) was expressly inadmissible at the evidentiary hearing pursuant to section 1172.6, subdivision (d)(3).

Appellant argued the parties' stipulation at the preliminary hearing that Espinoza was a gang expert, and his testimony about gangs, constituted inadmissible character evidence that was prejudicial under Evidence Code sections 1101 and 352, and should be excluded from the evidentiary hearing.

Appellant moved to introduce new evidence on the question of whether he acted in self-defense, and argued the People could not prove beyond a reasonable doubt that he was guilty of murder because he acted in self-defense.

## The Trial Court's Rulings on Appellant's Evidentiary Objections

On February 21, 2024, the court held a hearing on appellant's objections to its consideration of certain preliminary hearing testimony at the section 1172.6 evidentiary hearing.

As explained above, the court granted appellant's motions and excluded the hearsay testimony of Guzman, Haney, and Espinoza, that was admitted at the preliminary hearing under section 872, subdivision (b), and Espinoza's testimony about certain gang evidence under *Sanchez.*

As a separate objection, appellant moved to exclude all remaining gang evidence that was introduced at the preliminary hearing, because it constituted inadmissible character evidence. Appellant also argued the gang evidence was inadmissible because of Assembly Bill 333's amendments to section 186.22's definitions of criminal street gangs. The court overruled both objections to the gang evidence:

"I believe this evidence is relevant to motive in this case, as well as malice, as well as the identification of [appellant] as the perpetrator. [¶] It's not admitted under [Evidence Code section] 1101 as character evidence. It's not unduly prejudicial. First off, there's no risk here in a court trial in my view that the issues will be confused or that the trier of fact's passions will be inflamed. It's highly probative evidence for the reasons I cited, and the prejudicial impact is nothing beyond the prejudice inherent in any evidence damaging to the defense."

## THE EVIDENTIARY HEARING

On February 26, 2024, the trial court conducted the section 1172.6 evidentiary hearing.

## N.J.

N.J. was the first witness, and testified that on July 30, 2011, she attended a party at E Street and Bardsley in Tulare. The prosecutor asked N.J. if anything happened at the party. N.J. replied: "Not that I could think of, no."

The prosecutor asked if there was "a shooting or anything." N.J. testified: "Yes, somebody did get murdered that night." When asked if she knew the victim, N.J. testified that he was a family friend named Orlandis Perkins.

The prosecutor asked N.J. to "tell us a little bit about the party." N.J. replied it was "so long ago" that she could not remember, but "we went to the party, something happened, we left. That was about it. I don't remember much of the details about everything that happened that night."

In response to the prosecutor's questions, N.J. said she did not know whether the party was big or small, or held inside or outside. She thought the shooting might have happened outside but could not remember.

The prosecutor asked N.J. if she knew Perkins and appellant. N.J. said she knew both men. The prosecutor asked if appellant was at the party. N.J. testified: "I can't recall. There was a lot of people there, so I'm not exactly sure," and "[t]here was [*sic*] so many people there, I don't remember exactly who all was there. I couldn't give you like a description of who was there."

15.

The prosecutor asked N.J. if she remembered calling 911 and later talking to a detective. N.J. testified: "Not that night, I don't remember talking to the detectives, no," and she did not remember calling 911.

"Q. Those kind of events don't stand out in your memory?

"A. No. I don't believe I was the person that called 911. I don't remember that.

"Q. Do you call 911 often?

"A. No. [¶] … [¶]

"Q. So you would expect to remember having called 911—

"A. Yes.

"Q. —wouldn't you?

"A. If I had called, I would have remembered, yes.

"Q. So is it your testimony that you did not call 911?

"A. Not that I recall, that is correct."

The prosecutor asked N.J. if she remembered talking to officers on the night of the shooting. N.J. testified: "I honestly don't remember. I remember talking to people, but I don't remember what night it was, if it was that night, a different night. If it was that night, I couldn't tell you."

"Q. Okay. Would you agree that if it was that night that the events were fresh in your mind—

"A. I would believe so.

"Q. —that night? [¶] Okay. And were you truthful with the police?

"A. I would believe so, yes."

The prosecutor asked N.J. if she stayed at the party the entire night. N.J. said she believed so. The prosecutor asked how the party ended. N.J. said "we had to wait to get

16.

the car out" from where it was parked, but she did not remember how long "we were over there" or how late she stayed. She did not remember why the party ended.

When asked about the shooting, N.J. testified she believed she was outside when it happened, but she did not remember seeing Perkins. The prosecutor asked if it was a "music release party" for a new album. N.J. wasn't sure.

N.J. testified she had lived in Tulare her entire life. When asked if she was familiar with members of the Teflon and Mob gangs, N.J. said she did not associate with gangs.

The prosecutor asked N.J. where she was standing when the shooting happened. "I don't remember—I just remember—I mean, I believe I was standing like in the road or something. I'm not sure to be honest with you. I just vaguely remember the events [of] that night. It's been so long, I can't—it's not sharp in my brain."

In response to further questions, N.J. testified she did not recall telling the officers that she saw the shooting or appellant was the person who shot and killed Perkins. N.J. did not remember seeing a single shoe left at the scene. She did not recall telling a detective that she saw the shoe, or that she said the shoe belonged to appellant and not to Perkins because Perkins was wearing shoes when he was shot.

> "Q. Did you tell … Guzman that Perkins was following [appellant] and [appellant] somehow knew that Perkins [was] behind him and then someone said, 'fire on him,' and then he turned around with no hesitation and shot Perkins? Did you say that?
>
> "A. I can't say that I did. If there was something that you have then maybe at that time, but now I don't know. I don't remember. I don't know what—what I guess I told the officer or … Guzman."

The prosecutor showed N.J. the transcript of her prior interview with Guzman, and asked her to review her statements and if she recalled making them. N.J. testified she could not remember talking to a detective or making the statements, and she could not "sit here and tell you that that's what happened."

17.

The prosecutor asked N.J. if she told Guzman that appellant shot Perkins once, she saw the muzzle flash, she ran away, and she looked and saw appellant shoot Perkins several more times when he was on the ground. N.J. said she did not recall making these statements.

N.J. testified she did not tell Guzman that she was with gang members because she did not remember being with any gang-affiliated people, and she was not aware if there were gang members at the party. She denied that she previously got emotional when she told Guzman that she knew Perkins's condition after he was shot, that she saw holes in his head, or that she even saw Perkins. N.J. testified she would not have looked at Perkins after he was shot.

The prosecutor showed the photographic lineup to N.J., and asked if she identified appellant as the shooter and wrote a description of the shooting on the lineup card. N.J. testified she did not recall looking at a photographic lineup, identifying anyone, or writing something about the shooting. She acknowledged her initials were next to appellant's photograph on the lineup card, but the written statement did not look like her handwriting and she did not recall making that statement.

### *Cross-examination*

Defense counsel asked N.J. about several aspects of her prior statements to Guzman. N.J. again testified she did not recall making the statements. When asked to review the transcript, N.J. testified Guzman was the first person to state appellant's name during the interview.

Defense counsel asked N.J. if she felt pressured by the officers during her interviews. N.J. again testified she did not remember being interviewed.

Defense counsel asked N.J. if she remembered speaking with defense investigator Jake Torrence in August 2012. N.J. remembered speaking to someone but did not know his name. After reviewing Torrence's report about the interview, N.J. testified she did

not remember giving the interview, or that she told someone that she felt pressured by the officers to say appellant's name, or she could not identify appellant as the shooter.

N.J. testified the statement that she allegedly wrote about the shooting on the lineup card did not look like her handwriting, she never said appellant was the shooter, and the written statement wasn't accurate about what happened.

N.J. eventually testified she went to the party with her cousins and a shooting happened that night, but she could not remember who was there or what happened after the shooting. N.J. remembered people running away after the shots were fired, and N.J. and her friends had to stay because they couldn't get to their car.

### *Further Examination*

The prosecutor asked N.J. to review the transcript of her prior interview with the officer, and asked who was the first person to mention appellant by name. N.J. conceded she was the first person who mentioned appellant's name during the interview. N.J. also conceded the officer stated appellant's name only to clarify what she already said. However, N.J. again testified she did not remember talking to the officer, or that she said it would hard be hard for her to forget the incident of July 30, 2011.

On recross-examination, defense counsel asked N.J. whether she first mentioned appellant's name to the officer but only said where she saw him at the party, and did not say he was the shooter. N.J. said yes.

### Guzman's Testimony About N.J.'s Prior Statements

Guzman was the prosecution's next witness, and testified he responded to the shooting scene, made contact with N.J., and conducted a recorded interview with her.

Guzman testified about N.J.'s statements during their interview.[12] N.J. said there had been a party, "there [were] different gang members from different gangs there," and

---

[12]    In part III. of the Discussion below, we address the court's decision to permit Guzman to testify at the evidentiary hearing about his interview with N.J. as her prior inconsistent statements. (Evid. Code, §§ 1235, 770.) There is no indication that the court considered

19.

identified the gangs as Teflon and 209 Mob. N.J. said Perkins was shot, and appellant was the shooter. N.J. gave a physical description of appellant that was consistent with his appearance.

Guzman testified he asked N.J. about the shooting. N.J. said that before the shooting, the party was "shutting it down" because "there was tension, there was [*sic*] rival gangs there that they had to terminate the party," and that's why everyone was outside. She said Perkins ran "from behind at [appellant] and [appellant] turned around and shot him." N.J. said someone yelled "'[f]ire at that [N-word].'" N.J. said appellant turned around and immediately shot Perkins without pausing.

N.J. said she saw "the fire from the gun" when appellant fired the first shot, referring to the muzzle flash. N.J. saw Perkins fall down. N.J. started running, but kept looking at appellant, and she saw appellant shoot Perkins again as he lay on the ground. N.J. said that someone ran away and left behind a shoe at the scene. N.J. said Perkins was wearing both shoes, and it was appellant's shoe that was left behind.

Guzman testified that after his conversation with N.J., he presented a photographic lineup to her. N.J. identified appellant as the shooter, and wrote comments about the shooting on the lineup card.

The prosecution introduced the photographic lineup into evidence at the hearing. The lineup card showed one photograph was circled, with the initials "N.J." and an illegible signature next to it. The following sentence was handwritten above the lower row of photographs: "He was standing on the side and started walking[.] I seen Orlandis run up and he turned around and shot."

Guzman's preliminary hearing testimony about N.J.'s prior statements when it denied appellant's petition.

### *Cross-examination*

In response to defense counsel's cross-examination, Guzman testified that N.J. said appellant was walking away from the party just before the shooting. N.J. said Perkins was running and "came up from behind" appellant.

> "[Defense counsel]: And [N.J.] told you that she observed Orlandis Perkins running, trying to sneak up on [appellant], correct?
>
> "[Guzman]: Yes. She said he came up from behind him.
>
> "Q: And [Perkins] was trying to sneak up on [appellant], like he was trying to attack him is what [N.J.] observed?
>
> "A: Right.
>
> "Q. Okay. And that someone yelled fire on that N word, that [N.J.] heard that?
>
> "A. Correct.
>
> "Q. And at that time [N.J.] observed [appellant] turn around and immediately shoot?
>
> "A. Yes."

Guzman testified N.J. said she heard one shot and saw Perkins go down. N.J. said there was a pause, she started running, and she heard additional gunshots.

## Haney's Testimony About N.J.'s Prior Statements

Haney was the next prosecution witness, and testified he saw a single shoe at the shooting scene and ordered it to be collected as evidence.

Haney testified N.J.'s testimony at the evidentiary hearing was very different from his prior interview with her on May 2, 2012. During their interview, N.J was very talkative and "did a lot of the talking." "I would ask questions and she responded. I didn't have to remind her of any names. I didn't have to remind her of anything."

Haney testified that "early on" in that interview, N.J. "agreed with me when I said this would be a hard incident to forget. So obviously 12 years ago she would have –been fresh in her mind about the incident that happened than it is today in 2024."

Haney testified N.J. identified appellant as the shooter and used his first name, "Torrian," throughout the interview. She identified the victim as "Orlandis." N.J. said she saw appellant at the party and gave him a hug. N.J. said at some point, she saw appellant walk away from the party, and he was approached by two individuals, who said "'You got beef,' and she took that as a possible starting of a fight." N.J. said appellant "just walked away and said nothing."

N.J. said that as appellant walked away, Perkins "kind of jogged up or walked quickly up to [appellant] from behind …." N.J. said she heard people say "fire on him" before the first shot was fired. N.J. said appellant turned around and immediately shot Perkins "after being walked up on." After the first shot, N.J. said she did not immediately run away, but heard about three more shots and then she ran.

**Jake Torrence (Defense Investigator)**

Jake Torrence was called as a witness by appellant, and testified he was the defense investigator in appellant's case prior to his plea. Torrence interviewed N.J. on August 15, 2012. Torrence did not record the interview but wrote a report about it.

Torrence testified that N.J. said she saw the shooting and she could not identify the person who fired the shots. N.J. said she often "runs across" appellant in Tulare.

Torrence asked N.J. about her two prior statements to law enforcement, where she identified appellant as the shooter. N.J. said, "the detective had talked to her for a long time before he turned on the tape-recorder and that he had indicated to her that he had information that [appellant] was the shooter." N.J. said she talked to Haney within three weeks of the shooting, and denied that she talked to him in May 2012.[13]

---

[13] Guzman interviewed N.J. on July 11, 2011, and Haney interviewed N.J. on May 2, 2012.

Torrence testified N.J. said she saw appellant that night, and two men challenged appellant to a fight. Appellant did not say anything and walked away. N.J. said Perkins ran toward the man who eventually shot him. N.J. said she never saw the gun, but she saw the "flames" from the gun when it was fired.

Torrence asked N.J. if she was shown a photographic lineup and identified someone. N.J. said "she did pick out [appellant] in a photographic lineup. But she went on to say that she believed that was just because he was in the area of where the shots were fired."

N.J. said the shooter was a Black male wearing a blue jersey over a white shirt. Torrence asked N.J. what appellant was wearing. N.J. said appellant was not wearing a blue jersey. Torrence asked N.J. if she saw appellant shoot Perkins, and N.J. said she did not know.

**The Parties' Closing Arguments**

In closing argument, the prosecutor argued N.J.'s prior statements to Guzman and Haney were admissible and credible, appellant was the actual shooter, and there was proof beyond a reasonable doubt that appellant was the gunman who shot and killed Perkins and his petition should be denied.

Defense counsel argued the People failed to introduce any evidence about how many gunshots were fired, whether they were fired by the same caliber of gun, the trajectory of the shots, and whether there was only one firearm used. Defense counsel stated there were a lot of people at the party, and the People had to prove beyond a reasonable doubt not only that appellant was a shooter, but that he was the only shooter.[14] Counsel argued none of N.J.'s statements were credible, and the People could not argue that N.J. was both a liar and she truthfully identified appellant as the shooter.

---

[14] As will be discussed in part II. of the Discussion below, appellant never argued that the prosecution failed to prove beyond a reasonable doubt that Perkins was dead.

23.

The court asked if defense counsel was offering a felony-murder theory, and counsel said no. The court asked counsel to explain how the natural and probable consequences doctrine could have applied in this case. Counsel replied appellant could have been involved in disturbing the peace, assault with a firearm, or some sort of fight that would have triggered the natural and probable consequences doctrine, and there was evidence that someone ran up to appellant, potentially to start a fight. The court replied there was no evidence that appellant aided and abetted a nontarget offense that resulted in a homicide.

In a posthearing brief, appellant argued the trial court could not consider N.J.'s prior hearsay statements to Guzman and Haney, that appellant shot Perkins, because she testified at the evidentiary hearing that she could not remember what happened. Appellant asserted N.J.'s hearsay statements were not admissible as prior inconsistent statements because she only testified she could not remember what happened and did not make inconsistent statements.

Appellant further argued the amendments to sections 188 and 189 required the People to prove beyond a reasonable doubt he acted with malice, which required proof beyond a reasonable doubt that appellant did not act in self-defense, and the People failed to do so. The prosecutor stated that "the law requires that the People and the defense put forth evidence to carry their respective burdens." The court interrupted and stated, "I don't know if the defense has to put forth anything." The prosecutor agreed, and stated the People had the burden to prove appellant was guilty beyond a reasonable doubt, and appellant failed to suggest any scenario where he was not the shooter.

### THE TRIAL COURT'S DENIAL OF THE PETITION

On March 21, 2024, the trial court filed a lengthy order after the evidentiary hearing that denied appellant's petition for resentencing.

## The Court's Factual Statement

The court's order began with the following factual statement based on the evidence that was introduced at the evidentiary hearing, and evidence it did not exclude from the preliminary hearing transcript:

"Orlandis Perkins was shot and killed in the street outside a house party on the evening of July 30, 2011. A single shoe, not belonging to Mr. Perkins, was left near the body. Mr. Perkins had been shot multiple times, including in the head. Soon after the shooting, Tulare Police Department Officer Jesus (Jess) Guzman spoke to [N.J.], who said she witnessed the killing. [N.J.] told Officer Guzman that Mr. Perkins was shot by [appellant]. She said that she knew both Mr. Perkins and [appellant]. Just before the shooting, she saw Mr. Perkins run up behind [appellant]; an unknown third party said 'shoot that [n]****,' at which point [appellant] turned and immediately shot Mr. Perkins. [Appellant] then shot Mr. Perkins again while he was on the ground.

"Officer Guzman showed [N.J.] a photo lineup containing the pictures of six individuals, one of which was [appellant]. [N.J.] picked the photo of [appellant] as the shooter by circling the photo and writing her initials alongside. Additionally, she handwrote on the photo lineup: 'He was standing on the side and started walking I seen Orlandis run up and he turned around and shot.'

"… Detective Brian Haney was the lead investigating officer in the Perkins homicide. He spoke to [N.J.] in May of 2012. This statement was recorded. At that time, [N.J.] again said that she saw [appellant] shoot Mr. Perkins. [¶]

"Detective Haney also took a statement from [appellant]. [Appellant] admitted that he was at the party, heard shots fired and ran from the scene. [Appellant] also admitted that he was an associate of the 'Teflon' gang, and that Mr. Perkins was a member of the '209 Mob' gang. These two gangs were rivals. [Appellant] denied leaving the shoe that was found near the body of Mr. Perkins, but Detective Haney obtained and viewed a video which depicted [appellant] wearing a pair of shoes matching the one left at the scene.

"On May 31, 2012, [appellant] was charged with the murder of Orlandis Perkins.…

25.

"On August 15, 2012, Jake Torrence, an investigator working on behalf of [appellant], obtained a statement from [N.J.]  During this interview, [N.J.] said she could not identify the shooter of Mr. Perkins.  She acknowledged picking [appellant] out of a lineup, but said she did so because he was in the area where shots were fired.  She further stated that the shooter was wearing a blue jersey, while [appellant] was not.  [N.J.] denied speaking with Detective Haney in May of 2012.  When Mr. Torrence asked [N.J.] if she saw [appellant] shoot Mr. Perkins, she said she did not know.  [N.J.] also told Mr. Torrence that she would run across [appellant] in the city of Tulare.

"At the [section] 1172.6[, subdivision ](d)(3) hearing held on February 26, 2024, [N.J.] testified.  She claimed that she did not remember a number of things about the events of July 30, 2011, including:  whether [appellant] was at the party, whether she spoke to the police, whether she called 911, whether she saw the shooting of Mr. Perkins, whether she kn[e]w anything about gang members being present at the party, or whether it was her handwriting that appeared on the photo lineup administered by Officer Guzman."  (Footnotes omitted.)

**Credibility of N.J.**

The court addressed the credibility of N.J.'s hearing testimony compared to her prior statements.

"Much of the testimony of [N.J.] at the evidentiary hearing on February 26, 2024 was not credible.  After observing her demeanor on the witness stand and comparing her testimony to the statements she previously made to Officer Guzman, Detective Haney and Investigator Jake Torrence, this court finds that *her claimed lack of memory of the events surrounding the shooting of Orlandis Perkins was deliberately evasive.*  Therefore, this court considers her prior statements to Guzman, Haney and Torrence for their truth, and in assessing her credibility.  (Evidence Code section 1235; *People v. Rodriguez* (2014) 58 Cal.4th 587, 633.)"  (Italics added.)[15]

Next, the court addressed the credibility of N.J.'s multiple statements.  It found her statements to Guzman and Haney were credible, but not those made to Investigator Torrence.

---

[15]     As will be addressed in part III. of the Discussion, the trial court relied on the prior inconsistent statement exception to the hearsay rule to permit the officers to testify about N.J.'s statements at the evidentiary hearing.

"[N.J.'s] statements to Officer Guzman were made soon after a startling event, at a time when her memories were fresh, and before motives other than truth-telling were likely to have influenced her statements.[16] [N.J.] knew both Mr. Perkins and [appellant] and thus was in a strong position to identify the involved parties. Particularly powerful in this court's view is the photo lineup in which she identified [appellant] as the shooter. Her handwritten statement on the photo lineup (admitted at the preliminary hearing and the [section] 1172.6[, subdivision ](d)(3) hearing as Exhibit #1) is potent evidence that her early statements implicating [appellant] as the killer are the truth. Her testimony at the [evidentiary] hearing to the effect that she did not recognize her writing or signature on the photo lineup was particularly lacking in credibility, and evidence of her evasiveness at the evidentiary hearing.

"[N.J.'s] statement given to Detective Haney in May of 2012 reinforces the strength of her initial statements to Officer Guzman. She again said that she saw [appellant] shoot Mr. Perkins. This statement was recorded by Detective Haney.

"[N.J.'s] August 15, 2012 statement to Investigator Torrence is not credible. This is the first statement given by [N.J.] after charges had been filed.[17] Her statement that she picked [appellant] out of the lineup only because he was in the area is not believable in light of her earlier statements to Guzman and Haney, and particularly given her handwritten statement regarding the events on the photo lineup. She told Torrence that [appellant] was not wearing a blue jersey that she observed on the shooter, yet went on to say that she 'did not know' when asked if she saw [appellant] shoot

---

**16** The court's statements refer to the excited utterance exception to the hearsay rule under Evidence Code section 1240, that requires: "'(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.'" (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) A statement meeting these requirements is "considered trustworthy, and admissible at trial despite its hearsay character, because 'in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief.'" (*People v. Clark* (2011) 52 Cal.4th 856, 925.) As will be explained in part III. of the Discussion, the trial court ultimately admitted the officer's testimony about N.J.'s statements as prior inconsistent statements.

**17** Haney interviewed N.J. on May 2, 2012, and the complaint was filed on May 31, 2012, charging appellant with murder.

27.

Mr. Perkins. *Her new and changed version of events is untrustworthy for the additional fact that she was willing to deny speaking with Detective Haney three months earlier even though Detective Haney recorded the conversation.*

"[N.J.'s] changing story is explained *by the filing of charges against [appellant]* and the fact that she often encountered [appellant] in the city of Tulare."

## Appellant's Guilt as the Actual Killer

The court found beyond a reasonable doubt that appellant shot and killed Perkins, and that when he did so, he acted with malice and the intent to kill.

"Mr. Perkins was shot repeatedly in the body and once in the head. The first shot was followed by a pause before the rest of the shots were fired. The location of the wounds and the timing of the shots indicate that the shooter acted with the clear intent to kill. Shooting a human being in the head unambiguously evinces an intent to kill. The pause between the initial and the followup shots clearly indicates an intention to make sure the victim was dead.

"The evidence does not raise a reasonable doubt as to the identity of [appellant] as the killer. For the reasons discussed above, [N.J.'s] early statements to Officer Guzman and Detective Haney, along with her handwritten statement on the photo lineup emphatically establish that [appellant] was the shooter. Her statement to Investigator Torrence that another blue jersey clad individual was the shooter is not credible. Beyond this non-credible statement from [N.J.], nothing beyond speculation exists to support the theory that someone other than [appellant] shot and killed Mr. Perkins. [N.J.'s] early statements implicating [appellant] are also corroborated by Detective Haney's discovery of the video showing [appellant] wearing shoes that matched the shoe left near Mr. Perkins' body."

## Appellant's Claim of Self-defense

The court acknowledged the parties disagreed as to whether self-defense could be an issue at a section 1172.6 evidentiary hearing. The court found the parties made reasonable arguments to support their positions, but declined to decide whether self-defense was relevant at the section 1172.6 evidentiary hearing because "even accepting

28.

[appellant's] standard, the prosecution has proved his guilt of murder *beyond a reasonable doubt*." (Italics added.)

The court held the "evidence related to the issue of self-defense and/or imperfect self-defense is insufficient to raise a reasonable doubt as to the lawfulness of the killing or the existence of malice. The evidence established that Mr. Perkins ran or jogged up behind [appellant]. Someone said 'shoot that [n]****,' which [appellant] did without hesitation. The immediate initial shot was followed by a pause and then more shots."

> "The fact that one individual runs up behind a second individual does not give rise to an objectively reasonable belief that deadly force is necessary to defend against the risk of death or great bodily injury. No evidence established or suggested that Mr. Perkins was armed. No evidence was presented that Mr. Perkins verbally threatened [appellant]. No evidence establishes that [appellant] saw Mr. Perkins running up behind him. These circumstances, considered in light of the absence of contrary evidence, also fail to indicate that [appellant] actually believed he needed to use deadly force to defend himself, or that he acted as a result of provocation."

The court concluded "the evidence establishes, beyond a reasonable doubt, that [appellant] personally shot and killed Mr. Perkins, with the intent to kill Mr. Perkins—without provocation and without a belief in the need to use deadly force to protect himself. [Appellant] is thus guilty of murder under California law as it exists after the changes to sections 188 and 189 made effective after his conviction."[18]

## DISCUSSION

### I. Senate Bill 1437 and Section 1172.6

We begin with Senate Bill 1437, which went into effect on January 1, 2019, and "amended the felony-murder rule by adding section 189, subdivision (e). [Citation.] It provides that a participant in the qualifying felony is liable for felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill,

---

[18] On June 25, 2024, appellant filed a notice of appeal from the trial court's denial of his petition, which this court treated as timely filed.

acted as a direct aider and abettor; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life." (*People v. Harden* (2022) 81 Cal.App.5th 45, 50.)

Senate Bill 1437 "also amended the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.'" (*People v. Harden, supra,* 81 Cal.App.5th 45, 50.)

Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder. (*People v. Pacheco* (2022) 76 Cal.App.5th 118, 124.) The amendments also "maintained the viability of murder convictions based on implied malice, and the definition of implied malice remains unchanged." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*).)

Senate Bill 1437 "also added former section 1170.95, which created a process for those convicted of murder under now obsolete accomplice liability theories to seek vacatur and resentencing. Effective January 1, 2022, the Legislature revised section 1170.95 through the passage of Senate Bill No. 775 (2021–2022 Reg. Sess.) .… [The p]etitioners who were convicted of attempted murder and manslaughter under now obsolete theories may also seek relief." (*People v. Ramos* (2025) 112 Cal.App.5th 174, 183; accord, *People v. Reyes* (2023) 97 Cal.App.5th 292, 295.)

Effective June 30, 2022, former section 1170.95 was renumbered section 1172.6, with no change in text. (*People v. Saavedra* (2023) 96 Cal.App.5th 444, 446, fn. 1.)

### A. *The Prima Facie Determination*

Section 1172.6 provides that a petitioner may file for resentencing if "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, *or manslaughter* .…" (*Id.*, subd. (a), italics added.)

30.

The petitioner must declare "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of murder, attempted murder, or *manslaughter* following a trial or *accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder* or attempted murder. [¶] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(1)–(3), italics added.)

After counsel is appointed and the parties have the opportunity to submit briefing, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (§ 1172.6, subd. (c).) In making the prima facie determination, the trial court "may look at the record of conviction … to determine whether a petitioner has made a prima facie" showing. (*People v. Lewis* (2021) 11 Cal.5th 952, 971.) The court cannot engage in factfinding and weighing of credibility when making the prima facie determination. (*People v. Lovejoy* (2024) 101 Cal.App.5th 860, 865.) Although the trial court may consider the "procedural history" in a prior appellate opinion, it cannot rely on the opinion's factual summary to make the prima facie determination. (*People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, 1238.)

### B.     *The Evidentiary Hearing*

"Once a petitioner establishes a prima facie case for relief and the superior court issues an order to show cause, the matter proceeds to an evidentiary hearing …." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951 (*Vargas*).)

"At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by

31.

the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

Subdivision (d)(3) of section 1172.6 addresses the evidence admissible at the evidentiary hearing:

> "The admission of evidence in the hearing *shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.* The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.…" (§ 1172.6, subd. (d)(3), italics added.)

We review the court's rulings on the admission of evidence for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 724.)

At the evidentiary hearing, the trial court acts as an independent factfinder, makes credibility determinations, and weighs the evidence. (*People v. Rodriguez* (2024) 103 Cal.App.5th 451, 457 (*Rodriguez*); *People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123; *Clements, supra*, 75 Cal.App.5th 294, 297.)

"Although the parties may offer new or additional evidence to meet their respective burdens, section 1172.6, subdivision (d)(3) does not contemplate a whole new trial on all the elements of murder. [Citation.] Rather, '[t]he retroactive relief provided by … section [1172.6] is a legislative "act of lenity" intended to give defendants serving otherwise final sentences the benefit of ameliorative changes to applicable criminal laws and does not result in a new trial or increased punishment.' [Citations.] Thus, the focus at the evidentiary hearing phase of a[] [section] 1172.6 petition is '*on evidence made relevant by the amendments to the substantive definition of murder*,' which, in the context of section 188, requires 'the prosecution to prove that all principals to a murder acted

32.

with malice aforethought.'" (*Vargas, supra,* 84 Cal.App.5th at p. 952, italics added; accord, *Rodriguez, supra,* 103 Cal.App.5th at p. 457.)

If the prosecution fails to meet its burden of proof, "the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

If the trial court "finds beyond a reasonable doubt that the petitioner is guilty of murder notwithstanding the amendments to sections 188 and 189, the petitioner is ineligible for relief under section 1172.6." (*Vargas, supra,* 84 Cal.App.5th at p. 951.)

"[A] trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ""'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'"" (*People v. Reyes* (2023) 14 Cal.5th 981, 988; accord, *People v. Emanuel* (2025) 17 Cal.5th 867, 885; *Vargas, supra,* 84 Cal.App.5th at p. 951.) "We review the whole record, 'not just the evidence favorable to the respondent[,] to determine if the evidence supporting the verdict is substantial in light of other facts.'" (*People v. Underwood* (2024) 99 Cal.App.5th 303, 314.)

With these principles in mind, we turn to appellant's claims of the court's alleged factual and legal errors.

## II.    Substantial Evidence That Perkins Died

Appellant argues the People failed to introduce substantial evidence at the evidentiary hearing that Perkins died and thus failed to meet its burden of proof beyond a reasonable doubt that he was still guilty of murder after the amendments to sections 188 and 189.

Appellant acknowledges that at the beginning of the preliminary hearing, the prosecutor stated: "We did discuss an agreed-upon—a mutual stipulation in that there

was an autopsy done by Dr. Hartman employed by Tulare County who deemed the cause of death to the victim in this case was caused by gunshot wounds." Defense counsel agreed to this stipulation without condition or limitation.

Appellant asserts the parties only entered into this stipulation for purposes of the preliminary hearing and there is no evidence they intended for it to apply in subsequent proceedings, such as the section 1172.6 evidentiary hearing. Appellant points out the coroner's report was not introduced at the preliminary or evidentiary hearing, and Officer Aguayo only testified at the preliminary hearing that the victim appeared unresponsive at the scene and he "'overheard'" a doctor say that the victim died.

Appellant concludes that given these purported evidentiary deficiencies, "[t]here was no legal basis for the lower court [at the evidentiary hearing] to consider appellant's preliminary hearing stipulation as evidence that Perkins died, therefore, and there was no evidence that he did [die]," and his petition should have been granted since the People failed to prove all elements of murder beyond a reasonable doubt.

### A.      *Evidentiary Objections*

"The corpus delicti of the crime of murder 'consists of two elements, the death of the alleged victim[] and the existence of some criminal agency as the cause, either or both of which may be proved circumstantially or inferentially.'" (*People v. Frye* (1992) 7 Cal.App.4th 1148, 1154 (*Frye*).)

In a section 1172.6 proceeding, however, the trial judge "isn't charged with holding a whole new trial on all the elements of murder. Instead, the parties will focus on evidence made relevant by the amendments to the substantive definition of murder." (*Clements, supra*, 75 Cal.App.5th at p. 298; accord, *Vargas, supra*, 84 Cal.App.5th at p. 952.)

The admission of evidence at the section 1172.6 evidentiary hearing "shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including

witness testimony, stipulated evidence, *and matters judicially noticed*." (*Id.*, subd. (d)(3), italics added.)

It is well-settled that "[t]he 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." (*People v. Seijas* (2005) 36 Cal.4th 291, 302.) "[T]he objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility." (*People v. Williams* (1988) 44 Cal.3d 883, 906.)

"'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.'" (*People v. Partida* (2005) 37 Cal.4th 428, 434.)

### B.    *Analysis*

Appellant's arguments about the alleged lack of evidence of Perkins's death, and the validity of the earlier stipulation, are meritless for several reasons. First, when the prosecutor stated the stipulation about Perkins's death at the preliminary hearing, defense counsel did not object and the parties did not state any limitations or conditions on the stipulation.

Second, a petitioner "cannot use a section 1172.6 resentencing hearing to relitigate facts already determined, whether by plea, admission, or verdict." (*Rodriguez, supra,* 103 Cal.App.5th at p. 458.) "Section 1172.6 does not create a right to a second appeal, and [a petitioner] cannot use it to resurrect a claim that should have been raised in [the] direct appeal." (*People v. Burns* (2023) 95 Cal.App.5th 862, 865.) Appellant was charged with the murder of Perkins, he pleaded no contest to voluntary manslaughter, and the trial court found a factual basis for his plea based on the preliminary hearing

transcript. In his appeal from the judgment, appellant did not assert his manslaughter conviction was invalid because of the alleged absence of admissible evidence that the victim died. Instead, he filed a *Wende* brief in his direct appeal, this court affirmed the judgment, and he did not raise such a claim in a petition for writ of habeas corpus.

Third, prior to the section 1172.6 evidentiary hearing, appellant filed a brief to exclude specific testimony that was introduced at the preliminary hearing, including the parties' stipulation that Espinoza could testify as a gang expert; the court denied this particular motion. However, appellant did not raise a similar objection to the parties' other stipulation at the preliminary hearing—that the autopsy showed Perkins died of gunshot wounds. Instead, appellant's posthearing brief stated that Perkins "was shot and killed on July 30, 2011," effectively conceding both the admissibility of that stipulation at the evidentiary hearing and that Perkins was dead.

Finally, at the evidentiary hearing and in his posthearing brief, appellant argued there was no forensic evidence about the caliber and trajectory of the bullets that killed Perkins, there could have been multiple gunmen at the party, and that the People had to prove both that appellant was the shooter and "he [was] the only shooter." Also in his posthearing brief, appellant declared that Perkins "was shot and killed" during a party. He never argued the People failed to prove Perkins died.

Appellant has forfeited this objection. By belatedly raising this untenable claim for the first time in this appeal, appellant improperly seeks to invalidate his conviction by denying the prosecution the opportunity to easily respond to this assertion.

### III. The Trial Court's Findings as to N.J.'s Credibility

Appellant raises several challenges to the court's findings about the credibility and admissibility of N.J.'s testimony at the evidentiary hearing, and her prior statements to the two officers and the defense investigator.

Appellant argues there is insufficient evidence to support the court's finding that N.J.'s testimony at the evidentiary hearing, that she could not remember the shooting

36.

incident, was purposefully evasive; the court abused its discretion to permit Guzman and Haney to testify about their interviews with N.J. as prior inconsistent statements; and the court's finding, that N.J.'s prior statements to the officers were credible, is also not supported by the evidence. Appellant further argues there is insufficient evidence to support the court's finding that N.J.'s prior statements to Torrence, the defense investigator, that she could not identify appellant as the shooter, were not credible.

Appellant complains that when the court made these evidentiary rulings, it improperly "elected to believe only the evidence that was incriminating." Appellant argues N.J.'s statements to Torrence, that she could not identify appellant as the shooter, were not "irreconcilable" with her prior statements to the officers, because she was trying to clarify and explain what she said to Guzman and Haney. Appellant posits there was "an entirely reasonable explanation" for N.J.'s statements to Torrence, and insufficient evidence to support the court's decision to discount the credibility of her statement that she could not identify appellant as the shooter.

### A. *Prior Inconsistent Statements*

Evidence Code section 1235 states: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 770."

Evidence Code section 770 states: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

"A witness's prior statement that is inconsistent with his or her testimony is admissible so long as the witness is given the opportunity to explain or deny the statement." (*People v. Ledesma* (2006) 39 Cal.4th 641, 710.)

"The 'fundamental requirement' of [Evidence Code] section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony. [Citation.] Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event. [Citation.] However, courts do not apply this rule mechanically. 'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness.' [Citation.] When a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219–1220, superseded by statute on other grounds as noted in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106–1107; accord, *People v. Rodriguez, supra*, 58 Cal.4th at pp. 632–633.)

"When the trial court concludes, on substantial evidence, that such professed lapses of memory are false, evasive devices to avoid truthful answers, it may admit, as 'inconsistent,' the witness's prior statements describing the events the witness now claims to have forgotten." (*People v. Arias* (1996) 13 Cal.4th 92, 152.) The court must determine whether a witness has feigned his or her forgetfulness, and the court's finding will be affirmed if there is a reasonable basis in the record for its conclusion. (*People v. Gunder* (2007) 151 Cal.App.4th 412, 418.)

The admission of a prior inconsistent statement pursuant to Evidence Code sections 1235 and 770 does not violate *Crawford v. Washington* (2004) 541 U.S. 36 and the Sixth Amendment because "[t]he circumstance of feigned memory loss is not parallel to an entire refusal to testify. The witness feigning memory loss is in fact subject to cross-examination, providing a jury with the opportunity to see the demeanor and assess the credibility of the witness, which in turn gives it a basis for judging the prior hearsay statement's credibility." (*People v. Gunder, supra*, 151 Cal.App.4th at p. 420.)

38.

At the section 1172.6 evidentiary hearing, "[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

**B.  *Analysis***

In this case, N.J. "'testified at length … and was subjected to lengthy cross-examination. The [trier of fact] had the opportunity to observe her demeanor, and the defense cross-examined her …. Even though she professed total inability to recall the crime or her statements to police, and this narrowed the practical scope of cross-examination, her presence … as a testifying witness gave the [trier of fact] the opportunity to assess her demeanor and whether any credibility should be given to her testimony or her prior statements.'" (*People v. Rodriguez, supra*, 58 Cal.4th at p. 633.)

There is substantial evidence to support the court's determination that N.J. was purposefully evasive when she testified at the evidentiary hearing. The court had the opportunity to observe and evaluate N.J.'s credibility and demeanor as she claimed an inability to remember anything about the shooting or her prior statements to Guzman, Haney, and even the defense investigator. As such, the court did not abuse its discretion in finding that Guzman and Haney could testify about their interviews with N.J. as prior inconsistent statements.

There is also substantial evidence to support the court's findings that N.J.'s prior statements to Guzman and Haney were credible, and her statements to Torrence were not credible. Guzman conducted the recorded interview with N.J. on July 11, 2011, about 30 minutes after the police responded to the shooting scene and found Perkins's body. Guzman described N.J. as very upset and not intoxicated. N.J. gave a detailed description of the shooting, said she called 911, identified appellant as the shooter, and selected his picture from the photographic lineup. Haney interviewed N.J. on May 2,

2012, and testified N.J. was very talkative, he did not have to remind her of any names, and she agreed that the shooting would be a hard incident to forget.  N.J. again identified appellant as the shooter, and her statements to Haney were consistent with her prior statements to Guzman in July 2011.

Torrence interviewed N.J. on August 15, 2012.  Even though this interview occurred just a few months after her interview with Haney, N.J. told Torrence she did not see the shooter, tried to explain her prior identification of appellant by claiming a detective said he had certain information before he turned on the tape recorder, and said she could not identify appellant as the shooter.

As the court found, N.J.'s "new and changed version of events" to Torrence, in which she tried to walk back her identification of appellant, occurred after the complaint was filed on May 31, 2012, charging appellant with murder, and was "untrustworthy" under the circumstances.

Given the court's factual and credibility findings, it did not abuse its discretion when it found N.J. was deliberately evasive at the evidentiary hearing.  There is substantial evidence to support the court's finding that N.J.'s statements to Guzman and Haney were credible, and her prior statements to Torrence were not credible under the circumstances.

## IV.   Section 1172.6 and Assembly Bill 333

Appellant acknowledges that prior to the evidentiary hearing, the trial court partially granted his motion to exclude certain gang evidence that had been introduced at the preliminary hearing.  However, appellant argues the court erroneously overruled his additional objection that all remaining gang evidence was inadmissible because of Assembly Bill 333's amendments to section 186.22.

Appellant argues that even if admissible evidence establishes that he was an "associate" of Teflon, "there was insufficient evidence to establish that the Teflon gang was a criminal street gang as defined by the law today" after the amendments to

40.

section 186.22, and any testimony at the evidentiary hearing about "the Teflon gang and appellant's purported association with that 'organization' was outdated and tainted," because the evidence about the two gangs at the preliminary hearing was based on section 186.22's "old definition" of a criminal street gang.

### A. *Assembly Bill 333*

Section 186.22, enacted as part of the California Street Terrorism Enforcement and Prevention Act (STEP Act) defines both a substantive offense for active participation in a criminal street gang, and an enhancement for committing a felony for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. (§ 186.22, subds. (a), (b).) The statute further defines a ""'criminal street gang,"'" and specified offenses that made up the targeted "'primary activities'" of a gang and the predicate offenses of the gang's members. (*People v. Clark* (2024) 15 Cal.5th 743, 751–752; see *People v. Renteria* (2022) 13 Cal.5th 951, 962.)

Assembly Bill 333 became effective on January 1, 2022, and made several changes to section 186.22. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).) "First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' [Citation.] Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. [Citation.] Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the

41.

offenses establishing a pattern of gang activity must be ones other than the currently charged offense. [Citations.] Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.'" (*Ibid.*)

Assembly Bill 333 also enacted section 1109, which requires bifurcation of trial on the gang substantive offense and gang enhancement from the other charged offenses if requested by the defendant. (*People v. Burgos* (2024) 16 Cal.5th 1, 7 (*Burgos*).)

Assembly Bill 333's amendments to section 186.22 are retroactive to all cases that are not final. (*Tran, supra*, 13 Cal.5th at p. 1207; *People v. Lopez* (2025) 17 Cal.5th 388, 396.) The bifurcation provisions in section 1109 are not retroactive to cases that have already been tried, even if the appeals were pending and cases were not final when section 1109 went into effect. (*Burgos, supra*, 16 Cal.5th at p. 8.)

### B.      *Analysis*

Appellant's arguments about Assembly Bill 333 are based on the supposition that his judgment was no longer final at the time of the section 1172.6 evidentiary hearing, so that the amended version of section 186.22 applied to the court's consideration of the gang evidence.

"[A] judgment becomes final '"where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari ha[s] elapsed."' [Citations.] Once that process ends, the judgment may be challenged on collateral review. *Merely filing a collateral attack does not make the judgment nonfinal.* As the high court has explained, collateral review is distinct from direct review in that it seeks to unwind a judgment that has been affirmed on appeal. [Citation.] For that reason, ""an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment."" [Citations.] But once a court has determined that a defendant is entitled to resentencing, the result is vacatur of the original sentence,

whereupon the trial court may impose any appropriate sentence." (*People v. Padilla* (2022) 13 Cal.5th 152, 162–163, italics added.)

In a section 1172.6 proceeding, the petitioner's judgment "will no longer be final once the trial court grants his petition for resentencing and vacates his murder conviction." (*People v. Keel* (2022) 84 Cal.App.5th 546, 565.) However, "[a]n order to show cause under section 1172.6 does not vacate the petitioner's sentence but, like the habeas corpus petition in *Padilla*, sets in motion proceedings to determine whether the petitioner is entitled to vacatur and resentencing. [Citation.] The original judgment remains final until that determination is made." (*People v. Guillory* (2022) 82 Cal.App.5th 326, 335–336.)

Appellant's judgment became final in 2016, after this court affirmed his direct appeal, and appellant did not file petitions to seek further review.

As in *Guillory*, the trial court's issuance of the OSC in this matter set in motion the postjudgment evidentiary hearing required by section 1172.6 to determine if appellant was entitled to relief. If the court granted relief, appellant's judgment would have no longer been final. The trial court denied appellant's petition and his sentence was never vacated.

Appellant's judgment was still final at the time of the evidentiary hearing, and he was not entitled to retroactive application of Assembly Bill 333's amendments at that hearing.

## V. <u>The Gang Evidence</u>

Aside from his arguments about Assembly Bill 333, appellant separately asserts the trial court erroneously admitted and considered gang evidence at the evidentiary hearing because it constituted prejudicial character evidence under Evidence Code sections 1101 and 352. Appellant asserts the court's denial of his motion to exclude all gang evidence was based on its erroneous finding that the Teflon and Mob gangs were rivals, and Espinoza's preliminary hearing testimony, admitted for purposes of the

evidentiary hearing, showed the contrary was true and the two gangs did not become rivals until after Perkins was shot.

### A.   *Admission of Gang Evidence*

"The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense. [Citation.] 'Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.'" (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.)

"Such evidence is admissible even when a gang enhancement is not charged, provided the probative value of the evidence is not substantially outweighed by its prejudicial effect." (*People v. Ramirez* (2022) 13 Cal.5th 997, 1095.)

"Even when it is relevant, however, 'courts should carefully scrutinize evidence of a defendant's gang membership because such evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged."'" (*People v. Chhoun, supra*, 11 Cal.5th at p. 31.)[19]

"Under Evidence Code section 352, the trial court may, in its discretion, exclude gang evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice. The decision on whether gang evidence is relevant and not unduly prejudicial rests within the broad discretion of the trial court. [Citation.] We will not disturb a trial court's exercise of discretion ""except on a showing that the [trial] court exercised its discretion in an arbitrary,

---

[19]    Even in cases where Assembly Bill 333's amendments to section 186.22 are applicable, gang evidence may still be admissible when relevant to the underlying charges. (*Burgos, supra*, 16 Cal.5th at p. 25, fn. 8; *Tran, supra*, 13 Cal.5th at p. 1208.) "[T]he fact that section 1109 requires bifurcation only upon a defendant's request suggests there are circumstances where a single trial remains appropriate." (*Tran, supra*, at p. 1208.)

capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'"'" (*People v. Garcia* (2024) 107 Cal.App.5th 1040, 1050.)

"'"'[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.'"'" (*People v. Bell* (2019) 7 Cal.5th 70, 105.)

We review the trial court's ruling on the admissibility and prejudicial nature of gang evidence for abuse of discretion. (*People v. Chhoun, supra*, 11 Cal.5th at p. 31.)

### B. Sanchez *and Expert Testimony*

As noted above, the trial court excluded some of Espinoza's testimony about gangs, and his responses to hypothetical questions, as inadmissible hearsay and opinion testimony in violation of *Sanchez*, but admitted the balance of the gang evidence.

Despite that ruling, "[a]s *Sanchez* observed, general testimony about a gang's behavior, history, territory, and general operations is usually admissible. [Citation.] The same is true of the gang's name, symbols, and colors. All this background information can be admitted through an expert's testimony, even if hearsay, if there is evidence that it is considered reliable and accurate by experts on the gang." (*People v. Valencia* (2021) 11 Cal.5th 818, 838 (*Valencia*).)

"Such information stands in contrast to information regarding the commission of a particular offense on a specific occasion. Experts with no personal knowledge of case-specific facts, or who do not rely on other admissible evidence establishing those facts, are simply 'regurgitat[ing] information from another source.' [Citation.] … 'What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception.' [Citations.] Without independent admissible evidence of the particulars of

the predicate offenses, the expert's hearsay testimony cannot be used to supply them.  In the absence of any additional foundation, the facts of an individual case are not the kind of general information on which experts can be said to agree." (*Valencia, supra*, 11 Cal.5th at p. 838.)

"[T]he particular facts offered to prove predicate offenses as required by the STEP Act are not the sort of background hearsay information about which an expert may testify.  Competent evidence of those particulars is required.  A gang expert may still render an opinion regarding the gang membership of the perpetrator of a predicate offense in response to a proper hypothetical question based on premises established by competent evidence." (*Valencia, supra*, 11 Cal.5th at p. 839, fn. omitted.)

"*Sanchez* observed that 'improper admission of hearsay may constitute state law statutory error' [citation], which would ordinarily be assessed under *People v. Watson* (1956) 46 Cal.2d 818….  However, if the improperly admitted hearsay is also testimonial within the meaning of the high court's confrontation clause jurisprudence [in] *Crawford, supra*, 541 U.S. at pp. 68–69[], the error is assessed under the federal constitutional standard of *Chapman v. California* (1967) 386 U.S. 18, 24 .…" (*Valencia, supra*, 11 Cal.5th at p. 840.)

### C.     *The Court's Rulings About the Gang Evidence*

On February 21, 2024, the trial court heard appellant's motion to exclude certain preliminary hearing evidence from the section 1172.6 evidentiary hearing.  The court partially granted appellant's motions and excluded hearsay evidence admitted at the preliminary hearing under section 872, subdivision (b), and hearsay and opinion evidence that was inadmissible pursuant to *Sanchez*.

In addition to appellant's specific objections, he also moved for the exclusion of all remaining gang evidence because it constituted inadmissible character evidence that was prejudicial under Evidence Code sections 1101 and 352.  The court denied appellant's motion:

"I believe this evidence is relevant to motive in this case, as well as malice, as well as the identification of [appellant] as the perpetrator. [¶] It's not admitted under [Evidence Code section] 1101 as character evidence. It's not unduly prejudicial. First off, there's no risk here in a court trial in my view that the issues will be confused or that the trier of fact's passions will be inflamed. It's highly probative evidence for the reasons I cited, and the prejudicial impact is nothing beyond the prejudice inherent in any evidence damaging to the defense."

On February 26, 2024, the trial court conducted the evidentiary hearing. On March 21, 2024, the court filed its lengthy order that denied appellant's petition, and it contained only three references to the gang evidence: (1) appellant admitted to Haney that "he was an associate of the 'Teflon' gang, and that Mr. Perkins was a member of the '209 Mob' gang," (2) the court stated "[t]hese two gangs were rivals," and (3) the court stated N.J. testified at the evidentiary hearing that she did not know anything about gang members being present at the party.

The court found beyond a reasonable doubt that appellant shot and killed Perkins, and acted with malice and the intent to kill. This finding was entirely based on N.J.'s statements to Guzman shortly after the shooting, and her affirmation of those statements to Haney, when she described the shooting and identified appellant as the shooter.

### D. *Analysis*

The court did not abuse its discretion when it denied appellant's motion to exclude the remaining gang evidence, and instead found the gang evidence was admissible and relevant as to motive, malice, and identity. The court made this ruling prior to conducting the evidentiary hearing, and its findings were consistent with *Chhoun*'s discussion of relevant reasons to admit gang evidence.

We note, however, the court's ruling about gang evidence was made at the hearing it held to consider appellant's objections on February 21, 2024, and prior to conducting the evidentiary hearing on February 26, 2024, and filing its order that denied the petition on March 21, 2024.

The entirety of the record demonstrates that in its order denying the petition, the court did not rely on any of the gang evidence to find the People proved beyond a reasonable doubt that appellant was the actual shooter in this case and acted with malice and intent to kill. The court found N.J.'s prior statements to Guzman and Haney were credible, where she identified appellant as the shooter, identified him in the photographic lineup, and described how appellant shot Perkins. The court relied on N.J.'s statements and found:

> "Mr. Perkins was shot repeatedly in the body and once in the head. The first shot was followed by a pause before the rest of the shots were fired. The location of the wounds and the timing of the shots indicate that the shooter acted with the clear intent to kill. Shooting a human being in the head unambiguously evinces an intent to kill. The pause between the initial and the followup shots clearly indicates an intention to make sure the victim was dead. [¶] The evidence does not raise a reasonable doubt as to the identity of [appellant] as the killer."

Despite its earlier ruling about the reasons to admit gang evidence, the entirety of the record shows the court did not rely on gang evidence to make findings on malice and identity. Instead, the court relied on N.J.'s prior statements to Guzman and Haney to find beyond a reasonable doubt that appellant was the actual killer and acted with malice and the intent to kill.

Moreover, the court properly relied on N.J.'s statements to the officers about the manner in which appellant shot Perkins as evidence of malice and intent. "Because direct evidence of a defendant's intent rarely exists, intent may be inferred from the circumstances of the crime and the defendant's acts." (*People v. Sanchez* (2016) 63 Cal.4th 411, 457.) A defendant's purposeful act of firing towards the victim at close range, inflicting a mortal wound, supports an inference of malice and the intent to kill. (*People v. Smith* (2005) 37 Cal.4th 733, 740, 741; *People v. Cardenas* (2020) 53 Cal.App.5th 102, 119–120; *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.)

In acting as the trier of fact, the court could rely on N.J.'s statements to the officers to find appellant acted with malice and intent to kill, and the court's findings are supported by substantial evidence.  (See, e.g., *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192 [five or six shots from a distance of five feet]; *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102 [substantial evidence of premeditation where the appellant fired one or two shots that disabled the victim, there was a pause, and the "appellant fired the third and fourth shots, which indicated [the] appellant's intent to make sure the victim died"].)

### E.     *The Court as Trier of Fact*

On appeal, appellant cites well-settled authorities to argue the gang evidence should have been excluded as highly prejudicial because of its potentially inflammatory impact on the jury.

When the court overruled appellant's motion to exclude all the remaining gang evidence, however, it expressly stated that it was not going to consider it as inadmissible character evidence under Evidence Code section 1101.  The court rejected appellant's arguments that the evidence would be prejudicial, and stated "there's no risk here in a court trial in my view that the issues will be confused or that the trier of fact's passions will be inflamed."

As the court noted, it did not preside over a jury trial but instead conducted an evidentiary hearing pursuant to section 1172.6.  In such a proceeding, we assume the trial judge will remain dispassionate and apply the law correctly, unless the record proves otherwise.  (*People ex rel. Reisig v. Acuna* (2017) 9 Cal.App.5th 1, 22.)  "While appellant[] describe[s] the challenged gang evidence as inflammatory, we are mindful that this case [did] not involve a jury, but rather a bench trial in which the trier of fact was a judge capable of weighing the evidence without being influenced by its inflammatory nature.  [Citation.]  The trial court expressly noted this point."  (*Ibid*.)

The court was statutorily mandated to act as the finder of fact, determine witness credibility, and make legal conclusions as to whether the People met its burden of proof.

The gang testimony that the court considered was not unduly inflammatory, and the court did not rely on the gang evidence to find N.J.'s prior statements were credible or that appellant was the acual killer.

### F. *Espinoza's Testimony About the Rivalry Between the Gangs*

Appellant argues the court's alleged reliance on gang evidence was based on the erroneous factual finding in its order denying the petition, that the Teflon and Mob gangs were rivals at the time that Perkins was killed. Appellant points to Espinoza's preliminary hearing testimony, that the Teflon and Mob gangs only became rivals after Perkins was killed at the party. Appellant asserts it was "undisputed" the two gangs were not rivals when Perkins was killed, and the prosecutor improperly sought to use the gang evidence "as a 'crutch' when the underlying evidence of a crime is underwhelming," and portray gang members as people who "will shoot 'rival' gang members on sight."

Appellant is correct that at the preliminary hearing, Espinoza testified on direct examination that "[b]efore this incident, Teflon and the Mob used to associate. But then [after the] Orlandis Perkins murder, you don't see them associating anymore." Espinoza also testified on direct examination about a predicate act committed by Robert S., a Teflon member, when he shot two members of the Mob gang on August 27, 2010, prior to the shooting of Perkins in 2011.

On cross-examination at the preliminary hearing, defense counsel asked Espinoza why the Teflon and Mob gang members did not get along at the party on the night that Perkins was shot. Espinoza testified:

> "But you have to understand is prior to this shooting [of Perkins in 2011], we had Robert [S.] shooting at Mob members [in 2010]. And prior to that shooting, we had other shootings with Mob members."

Espinoza thus testified there were already problems between Teflon and Mob members because of the Robert S. shooting in 2010, before Perkins was shot and killed in

2011. Such testimony would have supported a finding that the gangs were rivals when Perkins was shot.

Prior to the evidentiary hearing, however, the trial court granted appellant's motion to exclude part of Espinoza's preliminary hearing testimony as inadmissible hearsay and opinion evidence pursuant to *Sanchez*, which included Espinoza's description of the Robert S. shooting incident, and Espinoza's response to defense counsel's cross-examination question, that there were already problems between the two gangs when Perkins was shot in 2011, because of the prior Robert S. incident.

The court thus erroneously stated in its order that the two gangs were rivals because that finding was based on preliminary hearing evidence it excluded for purposes of the evidentiary hearing.

### G. *Alleged Prejudicial Error*

Referring to his earlier argument, appellant asserts that it is not "determinative" that Assembly Bill 333 is not retroactive to cases that are final on appeal, because the issue was "not whether bifurcation of the gang evidence was required. It is that the trial court considered irrelevant and tainted evidence of gang affiliation at appellant's … section 1172.6 evidentiary hearing. [The court] also misconstrued the evidence and found that the Teflon and 209 Mob gangs were rivals when they were not."

The trial court's erroneous reliance on Espinoza's preliminary hearing testimony, that the Teflon and Mob gangs were rivals at the time of the shooting of Perkins, as the motive for the shooting, does not constitute reversible error under any standard. The court's reference to the rivalry in its order was extremely brief and consisted of one sentence. (See, e.g., *People v. Ramirez, supra*, 13 Cal.5th at p. 1096.) Contrary to appellant's arguments, the court did not rely on any of the gang evidence as a purported "'crutch' [because] the underlying evidence of a crime [was] underwhelming." Instead, it relied on N.J.'s statements to the officers to find appellant was the shooter and acted with malice and the intent to kill.

51.

While the court initially held the gang evidence was relevant to motive, the court ultimately relied on N.J.'s prior statements to the officers as evidence of malice, intent to kill, and identity. "[M]otive itself is not an element of a criminal offense," but "evidence of motive is often probative of intent to kill." (*People v. Smith, supra*, 37 Cal.4th at pp. 740, 741.) "Evidence of motive aside, it is well settled that intent to kill or express malice … may in many cases be inferred from the defendant's acts and the circumstances of the crime." (*Id.* at p. 741)

Appellant argues the court's alleged reliance on the gang evidence to deny his petition was not harmless beyond a reasonable doubt because "[t]here was only one eyewitness, and she indicated at the evidentiary hearing that she had never seen appellant shoot the victim." Appellant's argument is solely based on N.J.'s statements to the defense investigator in August 2012, when she said that she could not identify appellant as the shooter.

As explained in part III. of the Discussion, however, the trial court found N.J.'s testimony at the evidentiary hearing, that she could not remember anything about the shooting, was purposefully evasive, and her statements to the defense investigator in August 2012, disavowing her prior identifications of appellant, were not credible under the circumstances, and the court's findings are supported by substantial evidence.

VI.     **Section 1172.6 and Self-defense**

Appellant argues N.J.'s description of the shooting supported his claim of self-defense, and the trial court erroneously rejected his self-defense claim by improperly shifting the burden of proof from the prosecution to him.

The People reassert an issue raised at the evidentiary hearing, that appellant could not assert defenses at the section 1172.6 hearing that were not related to whether he was still guilty of murder after Senate Bill 1437's amendments to the felony-murder rule or the natural and probable consequences doctrine.

We begin with whether a petitioner may raise defenses at the evidentiary hearing that are not related to the amendments to sections 188 and 189.

### A. *Section 1172.6 and Homicide Defenses*

At the section 1172.6 evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder … under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (*Id.*, subd. (d)(3).) The sole question "is whether the petitioner committed murder under a still-valid theory .…" (*Clements, supra*, 75 Cal.App.5th at p. 294.)

When the trial court acts as an independent factfinder in deciding whether a defendant is entitled to relief under section 1172.6, its "factual determinations are limited to 'issues made relevant by the changes to the law effected by [the amendments].'" (*Rodriguez, supra*, 103 Cal.App.5th at p. 457; accord, *Gomez v. Superior Court* (2024) 100 Cal.App.5th 778, 788.) "[T]he trial judge isn't charged with holding a whole new trial on all the elements of murder. Instead, the parties will focus *on evidence made relevant by the amendments to the substantive definition of murder*." (*Clements, supra*, 75 Cal.App.5th at p. 298, italics added.)

In *People v. Mares* (2024) 99 Cal.App.5th 1158 (*Mares*), the court addressed whether a defendant could raise defenses in a section 1172.6 proceeding. The defendant in *Mares* was charged with murder and pleaded guilty to voluntary manslaughter. The evidence presented at the preliminary hearing showed the defendant fought with and stabbed the victim. (*Mares, supra*, at p. 1162.) The trial court denied the defendant's section 1172.6 petition for failing to state a prima facie case because the record of conviction showed he was the actual killer. (*Mares, supra*, at p. 1163.) *Mares* held the petition was properly denied because the prosecution pursued a murder conviction based only on the theory the defendant was the actual killer, and "[n]othing in the record

53.

suggests [he] could have benefitted from Senate Bill 1437's changes in the law." (*Id.* at p. 1166.)

*Mares* explained that for the defendant to show entitlement to relief under section 1172.6, "he must assert he would have defended himself by offering facts to support a murder theory that is now abrogated ...." (*Mares, supra*, 99 Cal.App.5th at p. 1166.) "It is important to understand it is not relevant if [the defendant] wished to claim (for instance) that he was misidentified and another person committed the crime. That was a defense that was available to him at the time of his plea. Senate Bill 1437 has no bearing on it. New evidence of misidentification could support a petition for a writ of habeas corpus, but it would not show that he cannot be convicted 'because of' the changes to the law, as required by section 1172.6." (*Id.* at p. 1168.)

*Mares* further held:

> "Had [the defendant] gone to trial, he possibly could, for instance, have challenged the admission of his confession. [Citation.] *He may instead have acknowledged he was the killer but argued self-defense or some other justification*. [Citation.] These options were available to him at the time of his plea, *without any change in the law*. [The defendant] did not plead guilty to murder, he instead pled to manslaughter, and perhaps a jury would have returned a manslaughter verdict if he had gone to trial. Arguing today that he could not be convicted of murder for any of these reasons would not show he cannot be convicted 'because of the changes to Section 188 or 189' [citation], which is what he needs to establish a prima facie case." (*Mares, supra*, 99 Cal.App.5th at p. 1168, italics added.)

### B. The Parties' Arguments About Raising Defenses

During closing arguments at the evidentiary hearing, the court asked whether the prosecutor was arguing that "procedurally the defense is barred from raising defenses or considerations that are unrelated to the whole purpose behind the [section] 1172.6 [petition] in this case, for example, of self-defense. I take it you two [attorneys] would have brought it to my attention if there was a case that has decided this particular issue."

The prosecutor cited *Mares*, which was decided a few days prior to the hearing, and argued it held Senate Bill 1437 had no bearing on defenses that could have been raised at a trial, and that new evidence of misidentification would support a habeas petition but was not relevant under section 1172.6.[20]  The prosecutor argued the burden was on the People to show appellant was the actual killer, and "that's all that's required. Once we show that he's the actual killer nothing has been changed with regards to actual killers and the conviction should stand."

The court replied that section 1172.6 requires the People to prove beyond a reasonable doubt that appellant was guilty of murder.  The prosecutor agreed, and argued the People met the burden and proved beyond a reasonable doubt that appellant "killed with malice aforethought.  Based on the manner of his shooting, based on the way he continued shooting a person that was already on the ground and shot in the head, that exhibits malice aforethought."

The court thought it was "a little bit odd" that section 1172.6 was designed to provide relief to people "who were not actual killers, i.e., people that were committed under the felony murder law or under natural and probable consequences," but "10, 20, however many years down the road, they can put on some unrelated defense.  That seems to me to be what we have here."  The court continued:  "It seems like the defense is either [appellant] didn't do it at all, or if he did, it was a case of self-defense …."

---

[20]     *Mares* was decided on February 23, 2024, a few days before the evidentiary hearing was held.  On March 26, 2024, the defendant in *Mares* filed a petition for review.  The California Supreme Court granted review in *Mares* on May 1, 2024, and deferred briefing pending resolution of *Patton*, as to whether the trial court could consider the preliminary hearing transcript to make the prima facie determination under section 1172.6.  (*People v. Mares* (May 1, 2024, S284232).)

After *Patton* was decided, the Supreme Court dismissed review in *Mares* and did not depublish the decision.  (Cal. Rules of Court, rule 8.528(b)(1), (3); *People v. Mares* (July 9, 2025, S284232).)

Appellant argue that he could raise defenses and the burden remained on the People to prove beyond a reasonable doubt that he acted with malice and intent to kill beyond a reasonable doubt.

### C. *Analysis*

In denying appellant's petition, the trial court acknowledged the holding in *Mares*, but declined to decide whether it applied, and instead addressed the merits of appellant's self-defense claim.

As explained in *Mares*, however, appellant's self-defense claims were not relevant to the People's burden to prove beyond a reasonable doubt that he was guilty of murder after Senate Bill 1437's changes to the felony-murder rule and the natural and probable consequences doctrine. Senate Bill 1437 did not alter the law on self-defense, and the defense was available when appellant was charged and entered his plea. Appellant's attempt to show that he acted in self-defense was not relevant as to whether he could not be convicted of "murder … *because of* changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(3), italics added.)

## VII. The Court Did Not Shift the Burden of Proof to Appellant

Appellant asserts that when the court considered his claim of self-defense, it improperly shifted the People's burden of proof beyond a reasonable doubt to appellant to prove he acted in perfect or imperfect self-defense, in order to negate malice.

### A. *Self-defense and the Burden of Proof*

As explained in part I. of the Discussion above, at a section 1172.6 evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (*Id.*, subd. (d)(3).)

56.

"[W]hen a killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder." (*Frye, supra*, 7 Cal.App.4th at p. 1154.)

"A killing in perfect self-defense is justifiable homicide.  [Citations.]  Perfect self-defense requires that 'one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.'"  (*People v. Thomas* (2023) 14 Cal.5th 327, 385–386 (*Thomas*).)  "Imperfect self-defense, on the other hand, 'occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death.'  [Citation.]  Imperfect self-defense reduces an intentional, unlawful killing to voluntary manslaughter, a lesser included offense of murder, by negating a defendant's malice."  (*Id*. at p. 386.)

Section 189.5, subdivision (a) states:  "Upon a trial for murder, the commission of the homicide by the defendant being proved, *the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon the defendant*, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."  (Italics added.)

"While [section 189.5] would appear to place the burden of proof upon the defendant with respect to mitigation, excuse or justification [citation], it has long been established that the defendant need only raise a reasonable doubt with respect to those matters.  [Citations.]  Thus, under California law the defendant must raise the issue but does not bear any burden of proof or persuasion.  [Citation.]  … Where either the prosecution evidence or evidence presented by the defendant is sufficient to raise a reasonable doubt as to whether the killing was malicious, the prosecution bears the burden of persuading the [trier of fact] as to the defendant's actual mental state."  (*Frye, supra*, 7 Cal.App.4th at pp. 1154–1155.)

Similarly, "when imperfect self-defense is at issue in a murder case, the People must prove the absence of that circumstance 'beyond a reasonable doubt … in order to establish the … element of malice.'" (*People v. Schuller* (2023) 15 Cal.5th 237, 253.)

## B. *The Parties' Arguments*

In closing argument at the evidentiary hearing, the prosecutor stated that "the law requires that the People and the defense put forth evidence to carry their respective burdens."

The court interrupted and stated, "I don't know if the defense has to put forth anything." The prosecutor agreed the People had the burden to prove appellant was guilty of murder beyond a reasonable doubt, and argued appellant failed to suggest any scenario where he was not the shooter.

In appellant's posthearing brief, counsel stated the People had the burden to prove beyond a reasonable doubt that he acted with malice, and argued that burden included proving beyond a reasonable doubt that he did not act in perfect or imperfect self-defense, and the People failed to do so.

## C. *Analysis*

Appellant relies on a sentence in the trial court's order that denied his petition, and argues the court "impermissibly shifted the burden to appellant to '*raise a reasonable doubt as to the lawfulness of the killing and the existence of malice.*'" (Italics added.) Appellant asserts this italicized phrase shows the court failed to presume appellant was innocent, and improperly placed the burden on appellant to prove that he acted in reasonable self-defense.

Appellant's argument fails to address the entirety of the court's findings on self-defense. In its order denying appellant's petition, the court acknowledged the parties disagreed about whether it could consider self-defense at the evidentiary hearing, but declined to decide that issue because "even accepting [appellant's] standard, the prosecution has proved his guilt of murder *beyond a reasonable doubt*." (Italics added)

In this context, the court further found the "evidence related to the issue of self-defense and/or imperfect self-defense is *insufficient to raise a reasonable doubt as to the lawfulness of the killing or the existence of malice*," and then addressed the evidence that appellant relied on. The court's statement did not amount to shifting the ultimate burden of proof from the People to appellant, but instead was consistent with section 189.5, subdivision (a), that "the *defendant need only raise a reasonable doubt* with respect" to "mitigation, excuse or justification," and "[w]here either the prosecution evidence or evidence presented by the defendant is sufficient *to raise a reasonable doubt* as to whether the killing was malicious, the prosecution bears the burden of persuading the [trier of fact] as to the defendant's actual mental state." (*Frye, supra*, 7 Cal.App.4th at pp. 1154, 1155, italics added.)

As will be discussed in part VIII. of the Discussion below, the court also evaluated the evidence allegedly in support of appellant's claim of perfect or imperfect self-defense. The court concluded "the evidence establishes, beyond a reasonable doubt, that [appellant] personally shot and killed Mr. Perkins, with the intent to kill Mr. Perkins— *without provocation and without a belief in the need to use deadly force to protect himself*." (Italics added.)

The entirety of the court's order demonstrates it did not shift the burden of proof to appellant, and held the People met its burden to prove beyond a reasonable doubt that appellant was guilty of murder and did not act in perfect or imperfect self-defense.

## VIII.  The Court's Consideration of Appellant's Self-defense Claim.

Appellant argues N.J.'s prior statements, where she described the shooting, constituted substantial evidence that he acted in self-defense and committed a justifiable homicide, which negated malice, and the People failed to meet its burden to prove beyond a reasonable doubt that he was still guilty of murder.

59.

### A.     *Perfect and Imperfect Self-defense*

As explained in part VII. of the Discussion above, a killing in perfect self-defense is justifiable homicide and completely exonerates the defendant.  (*Thomas, supra*, 14 Cal.5th at pp. 385–386; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*).) "Perfect self-defense requires that 'one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.'" (*Thomas, supra*, at p. 386.)

"Imperfect self-defense, on the other hand, 'occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death.' [Citation.]  Imperfect self-defense reduces an intentional, unlawful killing to voluntary manslaughter, a lesser included offense of murder, by negating a defendant's malice." (*Thomas, supra*, 14 Cal.5th at p. 386.)

"Although the belief in the need to defend must be objectively reasonable, [the trier of fact] must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge ….' [Citation.]  It judges reasonableness 'from the point of view of a reasonable person in the position of [the] defendant ….' [Citation.]  To do this, it must consider all the ""'facts and circumstances … in determining whether the defendant acted in a manner in which *a reasonable man* would act in protecting his own life or bodily safety.'"" [Citation.]  As we stated long ago, '… a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind .…'" (*Humphrey, supra*, 13 Cal.4th at pp. 1082–1083.)

"[F]or either perfect or imperfect self-defense, the fear must be of imminent harm. 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of *imminent* danger to life or great bodily injury.'" (*Humphrey, supra*, 13 Cal.4th at p. 1082.)

## B.    *The Court's Order*

As explained above, the court addressed appellant's self-defense claim in its order and held:

> "The evidence established that Mr. Perkins ran or jogged up behind [appellant]. Someone said 'shoot that [N-word],' which [appellant] did without hesitation. The immediate initial shot was followed by a pause and then more shots. [¶] The fact that one individual runs up behind a second individual *does not give rise to an objectively reasonable belief* that deadly force is necessary to defend against the risk of death or great bodily injury. No evidence established or suggested that Mr. Perkins was armed. No evidence was presented that Mr. Perkins verbally threatened [appellant]. No evidence establishes that [appellant] saw Mr. Perkins running up behind him. These circumstances, considered in light of the absence of contrary evidence, also fail to indicate that [appellant] *actually believed* he needed to use deadly force to defend himself, or that he acted as a result of provocation." (Italics added.)

## C.    *Analysis*

In reviewing appellant's claims of perfect or imperfect self-defense, the court made its findings based on the testimony of Guzman and Haney at the evidentiary hearing, about N.J.'s description of the shooting in their prior interviews. Guzman and Haney testified to similar statements made by N.J., but even "[w]here the evidence is uncontroverted, but reasonable persons could differ on whether the resort to force was justified or whether the force resorted to was excessive, then the issue is *a question of fact for the trier of fact*." (*People v. Clark* (1982) 130 Cal.App.3d 371, 379, italics added, abrogated on other grounds by *People v. Blakeley* (2000) 23 Cal.4th 82, 92.)

The court, acting as trier of fact at the evidentiary hearing, found N.J.'s statements were insufficient to establish that appellant actually and reasonably believed in the necessity of defending himself from imminent danger of death or great bodily injury, or that he acted in the actual but unreasonable belief to defend himself, and the court's factual findings are supported by substantial evidence. (*Thomas, supra,* 14 Cal.5th at pp. 385–386.) There was no evidence that Perkins and appellant interacted or exchanged

words or Perkins was armed with any type of weapon that night. Haney testified N.J. said she saw appellant walk away from the party, and he was approached by two individuals, who said "'You got beef,' and she took that as a possible starting of a fight." However, N.J. said appellant "just walked away and said nothing." There was no evidence appellant and Perkins exchanged words during or after this incident. N.J. said Perkins ran up to appellant from behind him, but there is no evidence that Perkins displayed or brandished any type of weapon or made any threatening comments. Instead, other people shouted at appellant to shoot him. In response, appellant turned around, pulled his gun, and immediately shot Perkins.

"A defendant who had an actual and reasonable belief in being in imminent danger of death, but used more force than was reasonably necessary to repel the attack, or continued to use force after the danger no longer existed or reasonably appeared to exist, may not invoke [perfect] self-defense. [¶] … [T]he same rule … govern[s] imperfect self-defense: A defendant who had an actual but unreasonable belief of being in imminent danger of death, but used more force than was reasonably necessary to repel the attack, or continued to use force after the danger no longer existed or was actually believed by the defendant to exist, may not invoke imperfect self-defense." (*People v. Temple* (2025) 110 Cal.App.5th 1281, 1297.) After appellant fired the first shot, Perkins fell to the ground, and there was no evidence that Perkins made any attempts to attack appellant after he was shot, or even to get up. Nevertheless, appellant fired additional shots as Perkins was lying on the ground.

### Appellant's Reliance on Preliminary Hearing Testimony

Appellant asserts there was substantial evidence of self-defense based on N.J.'s prior statements to the officers. In making this argument, however, appellant partially relies on the testimony from Guzman and Haney at the preliminary hearing—that N.J. "saw appellant 'mugging' [B.R.] and [K.M.], two 209 Mob gang members," they challenged appellant to a fight and he walked away, "Perkins 'lunge[d]' at appellant, and

people were yelling '[s]hoot that [N-word].  Shoot that [N-word]' several times," and appellant fired.

Based on this summary, appellant asserts "there was compelling evidence that [he] acted in self-defense."  Appellant speculates that members of the Mob gang could have been yelling at Perkins to shoot appellant.  Appellant acknowledges Perkins was never found with a gun, but again speculates another member of the Mob would have picked it up before the police arrived.  Appellant concludes that "[e]ven assuming the facts most favorable to the prosecution, therefore, an objectively reasonable person in appellant's position would have believed that his life was in danger.  Appellant would not have known whether Orlandis Perkins, his assailant, was armed or not," and "[e]ven assuming, *arguendo*, that it was appellant who shot the victim, …, it was a split-second decision that was made when appellant reasonably believed that his own life was in danger."

As we have explained, Guzman and Haney testified at the preliminary hearing about N.J.'s hearsay statements pursuant to section 872, subdivision (b).  For purposes of the evidentiary hearing, the court granted appellant's motion to exclude their hearsay testimony about N.J.'s statements as required by section 1172.6, subdivision (d)(3), in the absence of another exception to the hearsay rule.  At the evidentiary hearing, the court correctly found N.J. was purposefully evasive in her testimony, and permitted Guzman and Haney to testify to N.J.'s prior inconsistent statements in their interviews with her.  Guzman and Haney thus testified at the evidentiary hearing about her statements.  Neither party, however, requested the court to revisit its earlier rulings and admit the officers' preliminary hearing testimony about their interviews with N.J. as prior inconsistent statements.

In any event, the preliminary hearing testimony quoted by appellant was substantially similar to the officers' testimony at the evidentiary hearing, with the exceptions of identifying the two men with whom appellant was exchanging looks, and N.J.'s statement that Perkins lunged at appellant.  At the evidentiary hearing, Guzman

testified N.J. said Perkins "came up from behind" appellant, "like he was trying to attack him." Haney testified that N.J. said Perkins "kind of jogged up or walked quickly up to [appellant] from behind …."

The court, acting as trier of fact, expressly rejected this evidence as establishing either perfect or imperfect self-defense because "[t]he fact that one individual runs up behind a second individual does not give rise to an objectively reasonable belief that deadly force is necessary to defend against the risk of death or great bodily injury," and "[t]hese circumstances, considered in light of the absence of contrary evidence, also fail to indicate that [appellant] actually believed he needed to use deadly force to defend himself, or that he acted as a result of provocation." The court's findings are supported by substantial evidence.

Appellant argues "[t]he fact that the prosecution allowed appellant to plead to voluntary manslaughter; thus, suggests that this really was a self-defense case." The record suggests another possible reason. N.J. was the only witness to the shooting, and gave a complete description of the event to Guzman shortly after it happened, and identified appellant as the shooter. On May 2, 2012, Haney interviewed N.J. and she affirmed her prior statements. On May 31, 2012, however, appellant was charged with murder. On August 15, 2012, N.J. told Torrence that she could not identify appellant as the shooter. In June 2013, the information was filed that charged appellant with murder and added the special circumstance. By the time of the scheduled trial in 2014, the prosecution may have decided to make the plea offer because it determined N.J. was going to be a hostile witness.

Finally, appellant makes the curious argument in support of his self-defense claim that "[i]f a law enforcement officer shot a known gang member who lunged at him as other gang members shouted [racial epithets] several times, it is hard to conceive that the police officer would have been charged with murder. A different standard should not have been applied here, but it was." Without addressing the merits of appellant's

hypothetical argument, we note "[t]he standard for evaluating the unreasonable use of force reflects deference to the split-second decisions of an officer and recognizes that, unlike private citizens, officers may use deadly force.  An officer ""'may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance.'"  [Citations.]  ""'Unlike private citizens, police officers act under color of law to protect the public interest.  They are charged with acting affirmatively and using force as part of their duties, because "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."""""  (*Lopez v. City of Los Angeles* (2011) 196 Cal.App.4th 675, 685.)

The court, acting as the trier of fact, reasonably concluded that even if appellant actually believed in the need to defend himself, he used force that greatly exceeded what was reasonable under the circumstances, negating both perfect and imperfect self-defense, particularly since he continued firing at Perkins even though Perkins went down after the first shot.  (See e.g., *Humphrey, supra*, 13 Cal.4th at pp. 1082–1083.)  Even if we view the evidence in the light most favorable to appellant, the court reasonably found it was unreasonable for appellant to react to someone running behind him by immediately shooting that person, pausing, and then firing additional shots even though that person was lying on the ground.

**<u>DISPOSITION</u>**

The court's order of March 21, 2024, denying appellant's section 1172.6 petition, is affirmed.


MEEHAN, J.

WE CONCUR:


FRANSON, Acting P. J.


DESANTOS, J.